**WINDSOR AUCTIONS, INC.,**
**a Florida corporation, and**
**JEWELRY AUCTIONS, INC.,**
**a Florida corporation**

Case No. _____

**Plaintiffs,**

**v.**

Division _____

**eBAY, INC.,**
**A Delaware corporation,**
**LIVE AUCTIONEERS, LLC**
**A New York Limited Liability Company,**
**Matthew Ledwith, an individual and**
**John Ralston, an individual,**

**Defendants.**

_____/

## COMPLAINT

Plaintiffs, WINDSOR AUCTIONS, INC., a Florida corporation, and JEWELRY AUCTIONS, INC., a Florida corporation (collectively "Plaintiffs"), hereby file this Complaint against Defendants, eBAY, INC., LIVE AUCTIONEERS, LLC, MATTHEW LEDWITH, and JOHN RALSTON (collectively "Defendants"), and state as follows:

### INTRODUCTION

This is an action for damages in excess of $75,000 exclusive of costs, interest, and attorney's fees.

### PARTIES

1.    Plaintiff Windsor Auctions, Inc. ("Windsor") is a Florida corporation with its principal place of business located at 113 Flagship Drive, Lutz, FL 33549.

Dockets.Justia.com

2.    Plaintiff Jewelry Auctions, Inc. ("Jewelry Auctions"), is a Florida corporation having its principal place of business at 113 Flagship Drive, Lutz, FL 33549.

3.    The Chief Financial Officer of both Windsor and Jewelry Auctions is Mr. Paul Fischer, who resides in Pasco County, Florida. Both Windsor and Jewelry Auctions conduct business in Florida.

4.    Defendant eBay, Inc. ("eBay"), is a Delaware corporation with its principal place of business at 2145 Hamilton Avenue, San Jose, CA 95125. According to the corporation's quarterly report filed with the Securities and Exchange Commission on February 29, 2008, eBay earned over $7.6 billion in net revenues in 2007 and has more than 233 million registered users, including users residing in the State of Florida.

5.    Defendant Live Auctioneers, LLC ("Live Auctioneers"), is a New York Limited Liability Company with its principal place of business located at 220 12th Avenue 2nd Floor, Building 23, New York, NY 10001.

6.    Defendant Matthew Ledwith ("Ledwith") is the former Director of eBay Live Auctions, a division or department of eBay, and held that position at all times material to the allegations contained herein. He is an individual domiciled in the state of California.

7.    Defendant John Ralston ("Ralston") is, and at all times material hereto was, the Chief Executive Officer of Live Auctioneers and is an individual domiciled in the state of New York.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. section 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the controversy arises between citizens of different states.

9.     Venue is proper in this Court pursuant to section 28 U.S.C. section 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

10.     This Court has personal jurisdiction over Defendant eBay pursuant to the Florida Long Arm Statute, section 48.193(1), Florida Statutes, because a substantial part of the events giving rise to this litigation occurred in Florida.     Specifically, eBay made written communications into this State and eBay is transacting business in this state by: (a) providing Internet sellers, including Plaintiffs, access to its website(s) and; (b) selling goods and/or services to residents of the State of Florida. The Florida Long Arm Statute further applies because eBay committed tortious acts in the State of Florida.

11.     This Court has personal jurisdiction over Defendant Live Auctioneers under the Florida Long Arm Statute, section 48.193(1), Florida Statutes, because Live Auctioneers is "operating, conducting, engaging in, or carrying on a business venture in this state" and is committing "tortious act[s] within this state." A substantial part of the events giving rise to this litigation occurred in Florida. Specifically, Live Auctioneers is transacting business in the State of Florida by: (a) providing Internet sellers such as Plaintiffs access to its website(s) and; (b) selling goods and/or services to residents of the State of Florida. The Florida Long Arm Statute further applies because Live Auctioneers committed tortious acts in the State of Florida.

12.     This Court has personal jurisdiction over Defendants Ledwith and Ralston under the Florida Long Arm Statute, section 48.193(1), Florida Statutes, because each of these Defendants actively participated in committing "tortious act[s] within this state" while "operating, conducting, engaging in, or carrying on a business venture in this state" and a substantial part of the events giving rise to this litigation occurred in Florida.

## GENERAL ALLEGATIONS

13.     eBay owns and operates the largest on-line marketplace in the world through its website located at www.ebay.com.

14.     In September of 2000, eBay launched Live Auctions, an auction marketplace whereby sellers can conduct economic transactions with potential buyers in a manner which allows anyone connected to the internet to electronically place bids in auctions that are allegedly occurring on the floors of auction houses in competition with live bidders. These live auctions were at all times material hereto and are currently facilitated through eBay's website located at www.ebayliveauctions.com ("eBay Live Auctions").

15.     The eBay Live Auctions have been successful, in part, with consumers because they purport to establish fair competition between internet bidders who place their bids through eBay Live Auctions with just a click of the mouse on their computer and "floor bidders" who are supposedly physically present at the site of the auction. eBay defines floor bidders on its website as "[b]idders participating offline in an auction."

16.     At all times material hereto, eBay promoted itself as the world's marketplace and represented on its website that it was offering "a level playing field, encouraging open, honest, and accountable transactions, and creating economic opportunities for everyone." See http://pages.ebay.com/aboutebay/trustandsafety.html (last visited September 8, 2008). Plaintiffs relied upon this representation in pursuing a relationship with eBay Live Auctions as a marketplace for Plaintiffs' goods.

17.     Prior to approximately 2002, prospective sellers in eBay Live Auctions registered directly with eBay and their auctions were administered directly by eBay.

18.     Subsequent to approximately 2002, Defendant eBay and Defendant Live Auctioneers established a partnership and joint venture wherein Live Auctioneers would bring auction catalogs and the sellers of those catalogs to the eBay Live Auctions website and would administer auctions on behalf of those customers.   In addition, Live Auctioneers offered technology, services and "back end" accounting to those sellers.   eBay and Live Auctioneers acted upon and conducted their partnership under that agreement from 2002 forward.   Further, on information and belief, this agreement between eBay and Live Auctioneers was formally memorialized sometime in 2004.

19.     At all times material hereto, Live Auctioneers sole business was to assist eBay, in partnership with and as part of their joint venture, in administering live auctions and in attracting additional live auction sellers for eBay Live Auctions.

20.     Live Auctioneers also warranted and represented that the marketplace it provided to its customers, including Plaintiffs, was a fair forum in which to conduct business.

21.     On information and belief, the category of jewelry sales is and was at all times material hereto one of the most popular among eBay bidders and generated the most revenue for eBay sellers, for Live Auctioneers, and for eBay Live Auctions.

22.     Plaintiffs, Windsor and Jewelry Auctions were at all times material hereto sellers of jewelry and had an international reputation as purveyors of fine quality jewelry and, prior to its involvement with eBay and Live Auctioneers, Windsor had enjoyed financial success, including conducting auctions on an exclusive ocean liner.

23.     On or about July of 2005, Plaintiff Windsor sent email correspondence to eBay in an attempt to register with eBay Live Auctions as a seller of jewelry in order to sell jewelry through eBay's Live Auctions platform.

24. Despite having never contacted Defendant Live Auctioneers, the response to Plaintiffs' inquiry to eBay came from eBay's partner, Live Auctioneers. In that response, Plaintiffs were informed that eBay was no longer accepting direct customers as sellers on the Live Auction platform. Live Auctioneers represented, however, that because of its partnership with eBay, an association with Live Auctioneers constituted the same arrangement as being a direct customer of eBay. There were to be no additional fees, access to potential bidders would be exactly the same with access to the full complement of Internet functions, and Plaintiffs' catalogs would be listed on eBay Live Auctions and displayed in eBay general search result listings in the same way that those sellers who, prior to the partnership between eBay and Live Auctioneers, had associated directly with eBay. Such representations were made with the full knowledge of and with the consent and acquiescence of eBay.

25. At that time Plaintiffs were never given the option to associate as direct customers of eBay and were specifically informed that such an option was simply no longer available.

26. Plaintiffs were told by Live Auctioneers' representatives that Live Auctioneers technology offered the exact same functionality and services as eBay Live Auctions, including streamlined accounting features, and that Live Auctioneers warranted, were part of and were committed to following eBay's promise to provide a fair and safe environment in which to conduct commerce between buyers and sellers.

27. Plaintiffs accepted eBay's and Live Auctioneers' representations and reasonably relied upon them and, accordingly, entered into agreements to use the Live Auction platform with eBay and Live Auctioneers.[1]

---

[1] Plaintiffs have not attached these Agreements to this Complaint because they bring no cause of action based upon these Agreements. Windsor and Jewelry Auctions are affiliated companies who have the same officers, directors and shareholders. Windsor commenced business with Live Auctioneers and eBay in mid 2005. Jewelry Auctions did not commence business with Defendants until January of 2007.

28. Starting in mid-2005, Windsor commenced selling jewelry through its relationship with Live Auctioneers and eBay Live Auctions on eBay's Live Auctions website, www.ebayliveauctions.com. From mid 2005 through 2006, sales for Windsor through eBay's Live Auctions website exceeded $1.4 million.

29. On information and belief, Live Auctioneers had more than six hundred (600) customers who used its interface, as Live Auctions sellers, to access eBay Live Auctions website. eBay maintained a considerably smaller number of direct customers who had entered agreements with eBay prior to eBay's partnership and joint venture with Live Auctioneers.

30. During the course of their business relationship Plaintiffs paid eBay and Live Auctioneers a fee of $1,500 for each "bundle" of five auction events, or $300 per auction, plus five percent (5%) of each sale. Such fees were split equally between eBay and Live Auctioneers. Accordingly, eBay received twice the revenue on Live Auction sales and on posted catalogs sales made by sellers who remained direct customers of eBay since there was no split of fees with Live Auctioneers for those customers.

31. Plaintiffs held more than 600 separate auctions through Live Auctioneers from the initiation of its relationship up until the time Plaintiffs selling privileges were terminated by Defendants.

32. For a live auction on eBay, the seller may upload a live action catalog containing up to 2,000 lots onto the eBay Live Auctions website. Each auction can be scheduled to last between three to twelve hours. Because auctions of items from different sellers are flowing through eBay search results listings at the same time, each lot is displayed within general eBay search results for a limited period of time to the millions of potential buyers registered as "users" on eBay.

33.     In the Live Auction format the items to be sold are displayed within the search results pages, under the appropriate categories, in eBay's general search results listings.

34.     The prospective purchaser then recognizes that the item is noted as a live auction by the display of a "paddle" next to the lot. If the eBay user desires to register and/or enter a live auction in progress, the eBay user follows the prompts to register for Live Auctions and then bids accordingly.

35.     Not only is this the most common method of gaining traffic (and ultimately bidders and actual buyers), but it is also the most cost-effective method, in that the inclusion in eBay's general search results is a large part of the value of the initial auction fee paid to eBay since eBay's website receives millions of "hits" every day from its eighty four million (84,000,000) active users.

36.     The number of potential buyers who view eBay's search results listings declines the farther down the eBay search results pages the buyer moves. For example, many more prospective buyers examine the objects for sale on the first few pages of eBay's search results listings than on the tenth and subsequent pages. Accordingly, the closer to the front of the eBay search results listings that a seller can market its items the greater chance for a successful sale.

37.     A fair marketplace, therefore, as is guaranteed and warranted by eBay and Live Auctioneers, cannot involve a system which gives advantages to certain sellers over others and cannot allow one seller to dominate the beginning pages of the eBay search results listings through any advantages or systems not made available to every other seller.

38.     From the very beginning of Plaintiffs' involvement with the eBay Live Auction system, there appeared to be a fundamental flaw in the manner in which items placed for bid in Live Auctions were displayed in the eBay search results listings. The flaw in question made the

default ending time for all individual lots in the Live Auction the ending time for the entire auction catalog and the eBay search results listed lots chronologically based on the end time for a seller's auction. As a result, while the lots might be seen a day before the actual auction, one may have to go through pages and pages of eBay search results listings before ever finding a particular lot being auctioned.

39. As time went by Plaintiffs noticed that the items they were offering for sale were many pages back from the first page of the eBay search results listings and that those beginning pages were consistently dominated by one of Plaintiffs' competitors (and his multiple companies) who was a direct customer of eBay.

40. Plaintiffs saw that the problem became proportionally worse starting in late 2006 as this same competitor increased the number of auctions being held on behalf of his companies and starting in late 2006 Plaintiffs sales dropped dramatically.

41. Between 2006 and increasingly throughout 2007, Windsor and Jewelry Auctions complained to various persons at eBay and Live Auctioneers, including but not limited to Ledwith and Ralston, about buyer complaints related to the lack of coordination between the end times of auction items and the end times of auction events which resulted in buyers returning to bid on an item which was no longer available and about the ability of one competitor to dominate the first pages of the general search results.

42. Live Auctioneers and eBay, in response to Plaintiffs' complaints, instructed Plaintiffs that the solution to the problems was to hold more auctions at, of course, greater expense to Plaintiffs. Plaintiffs relied upon these representations and increased the number of auctions they were holding and thus paid additional fees to eBay and Live Auctioneers.

43.     Plaintiffs continued to complain to eBay and Live Auctioneers personnel relating to the lack of coordination between the end times of auctions and the end time of auction events because Plaintiffs sales remained significantly lower and their items continued to be buried many pages down the eBay search results listings.  In response, Plaintiffs were informed by eBay personnel that eBay Live Auctions were "dynamic" and that the end times on lots displaying within eBay search results listings were "moving targets". eBay personnel told the Plaintiffs that there was "no fix" and "nothing on the roadmap" in the future to correct the problem, if such a problem even existed.  These statements were not true and were known to eBay and Live Auctioneers not be true at the time they were made.  In fact, Defendants knew that a problem existed, knew that there was a fix to the problem but did not share this information with Plaintiffs and deliberately concealed their knowledge.

44.     Commencing sometime in late 2006, Plaintiffs realized that instead of enjoying increased projected sales, their domestic and international sales and revenues plummeted dramatically, while the sales of a direct eBay competitor in the live auction jewelry category did not seem affected.   Relying on the representations of Defendants, Plaintiffs, increased the number of their weekly auctions and the number of pieces in each auction event from 800 pieces per event to the maximum allowable by eBay of nearly 2,000 lots per auction. All of these efforts were costly and unsuccessful for the Plaintiffs.

45.     Specifically, during the time that the Plaintiffs' sales were dramatically reduced, Plaintiffs noticed that there was a corresponding substantial increase in the sales of one of their competitors, George Molayem ("Molayem").   Molayem operates a variety of businesses, including but not limited to Hillstreet Jewelers, Paramount Auctions, Jewelry Overstock Auctions and Wjoutlet, all of which conduct live auctions as a direct customer of eBay.

46.     Molayem's competitive advantage was as a result of him manipulating the end times of his auctions by use of a function located on eBay's Live Auction Catalog Management Set-Up Page which will be referenced to herein as the "Schedule Duration function." The result of this manipulation was that his companies' products dominated the forefront of eBay general search results listings, which are the most frequently visited pages of eBay.com by prospective purchasers.     Defendants knew of this manipulation and concealed their knowledge from Plaintiffs and other live auction sellers.

47.     Prior to the time that Plaintiffs Windsor and Jewelry Auctions entered the marketplace as live auction sellers, Molayem was approved by eBay as a live auction seller for the same services that Plaintiffs were told in 2005 that they would receive from eBay Live Auctions through its partner of Live Auctioneers.     Unlike Plaintiffs Windsor and Jewelry Auctions, Molayem was not directed to or required to use Live Auctioneers, or Live Auctioneers catalog management set-up page template, when he entered the live auction platform.

48.     When Plaintiffs Windsor and Jewelry Auctions noticed the dramatic drop in their sales as described above, they contacted eBay and Live Auctioneers personnel on numerous occasions in order to receive an explanation as to why Molayem was able to keep his sales items so prominently listed at the front of eBay's search results listings pages, while their own similar listings were buried many pages behind Molayem's listings.  eBay representatives denied that they knew how Molayem was accomplishing this feat.  This was not true.

49.     Finally, when it became clear that there was no explanation forthcoming from eBay or Live Auctioneers, and on or about late October 2007, Plaintiffs asked Molayem directly. They were surprised when Molayem told them he had manipulated the Schedule Duration function, contained in eBay Live Auctions' Catalog Management Set-Up Page.  When Molayem

manipulated the Schedule Duration function on the Catalog Management Set-Up Page, with eBay's knowledge and acquiescence, it allowed him to upload auction lots on a staggered end time basis. By manipulating the Schedule Duration function Molayem was able to place his sales items at the front of eBay's search results listings pages on an hourly basis, so that his items would always appear on the first few pages of the sales listings search results on the eBay website.

50.    After consulting with Molayem and in comparing eBay's interface with that of Live Auctioneers interface, it was clear that the distinct difference, while similar in appearance, was that the Schedule Duration was deactivated only on the Live Auctioneers interface after a Live Auction seller selected the initial duration of their auction during the catalog set-up process. This did not occur in the direct eBay interface.

51.    Upon visiting Molayem on October 29, 2007, Plaintiffs were informed by Molayem that, at all material times, he had been allowed by eBay to manipulate the Schedule Duration to his advantage.

52.    The eBay Catalog Management Set-Up Page is a page used by direct eBay live auction sellers to set up their initial catalogs. The live auction sellers insert the title of their catalog, a description of the auction event and select an eBay category in which their merchandise will appear within eBay search results pages and then select the duration of their auction. The live auction seller may select a period of time of three to twelve hours in which to complete the live auction event. Molayem (and at least one other seller in the jewelry category) manipulated the Schedule Duration function with eBay's knowledge and acquiescence.

53.    Molayem had been manipulating the system since at least 2005, creating auctions with staggered end times occurring one minute apart. This manipulation was known to eBay and

to Live Auctioneers prior to Plaintiffs becoming a seller on eBay Live Auctions, but the availability of the Schedule Duration function and the knowledge of how to use it to competitive advantage was concealed from Plaintiffs.

54. The problems became exacerbated and more prevalent and noticeable as Molayem increased the number of auctions that he held each day. By the end of 2006, Molayem was controlling so much of eBay's search results listings in the jewelry category that Plaintiffs' auction items hardly ever appeared on the top twenty pages of eBay search results and their total number of sales declined dramatically.

55. When Plaintiffs relayed the content of their conversation with Molayem and explained how Molayem was manipulating eBay search results listings to eBay personnel on October 29, 2007, they were told that there was no difference between eBay's Catalog Management Set-Up Page functionality and that of Live Auctioneers. These statements were not true and Defendants knew it at the time they made those representations.

56. Plaintiffs and all other Live Auctioneers' sellers were never informed that there was a difference in functionality between eBay's Catalog Management Set-Up Page and that of Live Auctioneers Catalog Management Set-Up Page. Plaintiffs did not learn the truth concerning the difference in functionality until Plaintiff's representatives learned the truth directly from Molayem.

57. Such a difference between these two pages provided Molayem and his entities an unfair advantage over all other live auction jewelry sellers who entered the eBay Live Auctions website through eBay's partner Live Auctioneers.

58. On information and belief, senior personnel at eBay believed that if all eBay Live Auctions sellers manipulated the Live Auction platform in the way Molayem did, then eBay Live

Auction listings would flood the forefront of eBay general search results listings, thus dominating eBay listings placed by non-Live auction sellers. Of course, even though the Live Auctions platform was extremely profitable for eBay, the non-Live Auction, traditional eBay seller platform was even more lucrative. Thus, eBay did not want all of the Live Auction sellers to be able to manipulate the Live Auction system to the detriment of regular eBay users and, therefore, concealed its existence from Plaintiffs and other Live Auctioneers' sellers.

59. As a result, the ability to manipulate the end times on Live Auction lots was reserved for the small number of direct eBay Live Auctions customers only, such as Molayem and at least one other, and was withheld from those sellers, such as Plaintiffs, who had been instructed that it could only sell on eBay's Live Auctions platform through eBay's partner Live Auctioneers.

60. On information and belief, Molayem's sales generated in excess of $500,000 in 2007 for eBay in fees and commissions and, accordingly, eBay allowed profits caused by Molayem's manipulation of the system to overshadow its alleged and stated commitment to provide a fair marketplace to and equality among all eBay Live Auction sellers including Plaintiffs.

61. When Plaintiffs contacted eBay about the search listing dominance of Molayem's companies, eBay concealed its knowledge of the problem and allowed the unfair marketplace to continue.

62. Despite the complaints of Plaintiffs and eBay's knowledge of the unfair market place and the advantages of Molayem and his companies gained through manipulation of the Schedule Duration function, eBay continued to represent that its market was fair and continued to accept the fees and commissions paid by Plaintiffs.

63. When Plaintiffs informed Live Auctioneers Chief Executive Officer Ralston of the difference in functionality between eBay's interface and that of Live Auctioneers interface, Live Auctioneers conducted "viability" tests on eBay Live Auctions at Plaintiffs' request by way of manipulating the Schedule Duration function in the manner done by Molayem. This test was performed by entering the "back-end" set-up page on eBay Live Auctions, which Plaintiffs and other sellers had been specifically instructed not to access because changes to that page "would" lead to accounting problems. These tests proved 100% successful and dramatically increased Plaintiffs' sales and online audience attendance. Live Auctioneers then created a series of "test auctions" on eBay Live Auctions to further confirm that in fact, the Schedule Duration function operated as stated by the Plaintiffs.

64. Upon confirming that the Schedule Duration function dramatically increased both sales and attendance on the eBay Live Auction platform, Live Auctioneers posted an announcement to their customers on their website in which they stated Live Auctioneers and eBay were jointly conducting "viability" tests and that if and when the option becomes available, Live Auctioneers would inform their customers of the release of such functionality.

65. On information and belief, Live Auctioneers never intended to make such an announcement because they knew that general use of this Schedule Duration function would flood (and dominate) the first few pages, in many selling categories, of eBay's general search listings results.

66. Live Auctioneers never made such an announcement and to this day the system continues to be manipulated by Molayem with the full knowledge and acquiescence of eBay and Live Auctioneers. Accordingly, Live Auctioneers customers remain at a competitive disadvantage even though both it and eBay still represent that its market is fair.

67.     Even after conducting viability tests, with eBay's full knowledge, Live Auctioneers was unwilling either to make this function available to their own live auction sellers or modify their Catalog Management Set-Up page to ensure that Plaintiffs and other Live Auctioneers' sellers had access to the full functionality of eBay's interface. Had eBay and Live Auctioneers told Plaintiffs about the Schedule Duration function, Plaintiffs would not have experienced the drop in sales that it experienced, which led Plaintiffs to expand into different markets as well as increase Plaintiffs' product offerings at considerable cost and increase its catalog costs by way of holding daily auctions at considerable expense to Plaintiffs.

68.     Had eBay followed its own rules and stopped Molayem from manipulating the system and rendering the market fundamentally unfair, Plaintiffs would not have experienced the drop in sales that they experienced, which led Plaintiffs to expand into different markets at considerable cost and increase its catalog costs by way of holding daily auctions at considerable expense to the Plaintiffs.

69.     On information and belief eBay assisted Molayem in his understanding and use of the Schedule Duration function so as to allow him to obtain the maximum benefit from its usage. Then eBay secretly allowed Molayem to continue to manipulate the Schedule Duration function, while denying its existence when asked directly on many occasions by many live auction sellers, including Plaintiffs, and preventing Plaintiffs from using it. eBay now openly condones such use of the Schedule Duration function by Molayem.

70.     eBay extended to Molayem a special privilege, which consisted of the use of the Schedule Duration function. That same privilege was not extended to Plaintiffs. In fact, when asked, Plaintiffs were told by eBay that no such function to coordinate the end times of auctions and to maximize eBay search results listings visibility during specific auction times existed, and

that the auction lot end times could not be changed to coordinate with the ending of the live auction event. This was not true.

71. eBay's awareness of the Schedule Duration function, while denying its existence to all who asked about its existence, created an unfair marketplace and a substantial competitive advantage for Molayem and a distinct disadvantage for Plaintiffs specifically. Defendants' secret acquiescence in Molayem's use of the Schedule Duration function destroyed any notion of fair competition. In short, Molayem's ability to display the lots in his various auction catalogs on a staggered end time basis during a lengthy auction gave him the ability to display his jewelry pieces with much higher visibility in eBay's search results listings.

72. In addition to knowing that Molayem was manipulating the platform to his own and eBay's financial gain, and at the expense of a fair marketplace, eBay was also aware that Molayem was violating eBay's terms and conditions and engaging in practices which made a mockery of the concept that buyers were actually engaging in an auction at all, as that term is commonly understood.

73. In fact eBay and Live Auctioneers deliberately, through representations on their websites, cultivated the image that Internet bidders were attending real auctions and competing against "floor bidders." In truth, during Molayem's Live Auctions, bids which were recorded as being a "floor bid" were actually made by Molayem's employees and were placed from a room at Molayem's headquarters which is called the "click room."

74. What sets Molayem's auctions apart from many others was that his merchandise was offered with bids commencing at just $1. Accordingly, whereas a reputable seller might show a floor bid as a bid against or near reserve, such a practice has no bearing on the practices

of Molayem, which were solely designed to provide the impression that other bidders were interested in bidding upon the item and thereby driving the price up artificially.

75.     eBay and Live Auctioneers knew that Molayem was engaging in shill bidding. Shill bidding, which is intended to artificially escalate price without regard to any reserve, violated eBay terms and conditions and eBay knew that the existence of such practices rendered the Live Auction marketplace anything but a fair and safe environment.

76.     eBay and Live Auctioneers also continued to turn a blind eye to other anti-competitive practices of Molayem, included but not limited to, linking to off-eBay web sites (including an Affiliate Program in which Affiliates were paid commissions by Molayem for operating as auctioneers from their homes) and shipping items which were not those that had been bid on and were in fact of a much lesser quality.  eBay knew that Molayem was misidentifying his items, valuing them at more than ten times their actual worth and certifying the quality of his jewels through a supposedly independent company, known as Allstate Certificate Advantage, which was actually owned and operated by Molayem.  Accordingly, Molayem's items dominated eBay search results pages and appeared to be high quality and were being sold for an initial bid of just $1.  Although Molayem accepted the return of many items from unsatisfied buyers, he retained a 15% buyer's premium and profited from disproportionate shipping charges and a 10% restocking fee.

77.     eBay knew exactly what Molayem was doing and continued to allow him to dominate its pages and engage in practices which made a mockery of any concept of fairness and open competition.  Because of Molayem's practices he generated massive fees and commissions for eBay.

78. Because of the money made for eBay by Molayem, eBay allowed his practices to continue despite the fact that they violated eBay's own rules and policies, helped him to manipulate the Schedule Duration function and hid the existence of such manipulation from Plaintiffs during the tenure of Plaintiffs' relationship with Defendants.

79. On information and belief, eBay only entered into its partnership and joint venture with Live Auctioneers, thereby surrendering half of its profits, in order to reserve the Schedule Duration function for its direct eBay Live Auctions customers. By having the majority of Live Auction sellers use the platform provided by Live Auctioneers, eBay avoided the potential problem of having its general search listing results flooded with eBay Live Auctions listings.

## COUNT ONE: FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT AGAINST EBAY, LIVE AUCTIONEERS, MATT LEDWITH AND JOHN RALSTON

80. Plaintiffs hereby incorporate paragraphs 1-79 as if fully set forth herein.

81. This is an action for damages in excess of the jurisdictional limits of this Court brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, sections 501.201 *et seq.*, Florida Statutes (the "Florida Act").

82. Plaintiffs are consumers within the meaning of the Florida Act.

83. The business relationship between Plaintiffs and Defendants, eBay and Live Auctioneers, as described herein, constitutes the conduct of trade or commerce within the meaning of the Florida Act.

84. Defendants, eBay and Live Auctioneers, severally and jointly through their partnership, and Defendants Ledwith and Ralston, engaged in unfair methods of competition and unfair or deceptive acts and practices in the conduct of their trade or commerce with Plaintiffs, within the meaning of the Florida Act, as set forth herein. Defendants Ledwith and Ralston actively participated in eBay and Live Auctioneers' unfair and deceptive trade practices.

85.     From a time commencing prior to Plaintiffs entering a relationship with eBay and Live Auctioneers and continually throughout the tenure of that relationship, eBay and Live Auctioneers, severally and jointly through their partnership, as well as Ledwith and Ralston, actively engaged in unfair and deceptive trade practices within the meaning of the Florida Act by guaranteeing and warranting to consumers generally, and to Plaintiffs specifically, that the Live Auctions platform was a safe and fair marketplace.  Defendants knew at all material times that these representations were false in that, among other reasons, direct customers of eBay enjoyed a distinct and significant competitive advantage not available to consumers such as Plaintiffs who were required to access the Live Auctions platform through Live Auctioneers.

86.     Throughout the entire time of their business relationship with Plaintiffs as described herein, eBay and Live Auctioneers, severally and jointly through their partnership, as well as Ledwith and Ralston, engaged in further deceptive and unfair trade practices within the meaning of the Florida Act including but not limited to the following:

> a.  creating a two-tier system of access to the Live Auctions platform which allowed certain direct customers of eBay to manipulate the system to such customers' competitive advantage while at the same time misrepresenting to others consumers such as Plaintiffs that the Live Auctions platform was a fair marketplace and that consumers dealing through Live Auctioneers were in the same position and treated the same as direct customers of eBay;
>
> b.  creating a system which allowed certain direct customers of eBay access to the Schedule Duration function for such customers' competitive advantage while denying access to the same for Live Auctioneers customers, who were required to use the Live Auctioneers' Catalog Management Set-Up Page;

c. providing guidance to Plaintiffs for the use of the Live Auctions platform which would ensure that Plaintiffs would not gain knowledge of the existence of the Schedule Duration function or learn how it could be used to ensure that their auction lots would be prominently displayed alongside those of their competitors;

d. continually misrepresenting to Plaintiffs that no function like the Schedule Duration function actually existed;

e. continually misrepresenting to Plaintiffs that eBay and Live Auctioneers had no knowledge of how Plaintiffs' competitors were able to place their listings of merchandise to the front of eBay's general search results listings;

f. misrepresenting to Plaintiffs that the solution to the cause of Plaintiffs' decline in sales, and the competitive advantage of their competitor, was to hold more auctions;

g. misrepresenting to Plaintiffs that the problems causing Plaintiffs' decline in sales would be remedied by Plaintiffs holding additional auctions;

h. offering Plaintiffs discounted pricing if Plaintiffs would hold additional auctions even though both Defendants knew that such action by Plaintiffs would not make Plaintiffs more competitive and would only increase the fees paid to these Defendants;

i. refusing to stop manipulation of the Live Auctions platform by Plaintiffs' competitor even though such manipulation could be stopped by eBay and Live Auctioneers; and

j. Plaintiffs' access to eBay Live Auctions was terminated by Defendants as a direct result of Plaintiffs' repeated insistence that the Live Auctions platform be a safe and fair marketplace and, once Plaintiffs learned the truth concerning Molayem's sanctioned manipulation, Plaintiffs' insistence that access to the Schedule Duration function be made available to all sellers.

87. Ledwith is the former Director of eBay Live Auctions, and at all times material herein, Ledwith supervised all customers of eBay Live Auctions and its partner, Live Auctioneers, including Plaintiffs.

88. Under Ledwith's supervision and direction, eBay entered into partnership with Live Auctioneers, requiring all future users of eBay to contract with a third party to enter the Live Auction system.

89. Ledwith on numerous occasions represented to Plaintiffs that there was no difference between being a direct customer of eBay and being a customer of eBay through Live Auctioneers and represented that the marketplace was fair and safe. Ledwith knew these representations were not true at the time he made them. By making such representations, Ledwith actively participated in Defendant eBay's and Live Auctioneers' deceptive and unfair trade practices within the meaning of the Florida Act. In addition, by virtue of his position with eBay as Director of Live Auctions, Ledwith possessed the authority to control the unfair and deceptive trade practices detailed herein.

90. By creating this two-tiered system of eBay Live Auction customers, Ledwith engaged in deceptive practices within the meaning of the Florida Act by representing to all new and future customers that eBay would continue to provide a fair and safe marketplace, even

though he had structured the system in a way that was inherently unfair and which ensured that equity between users did not exist.

91.    Ledwith further violated the Florida Act by continually and on numerous occasions misrepresenting to Plaintiffs that he had no knowledge of how Plaintiffs' competitor was manipulating the system and by continually denying the existence of the Schedule Duration function.

92.    At all times material hereto, Ralston was Chief Executive Officer of Live Auctioneers, and in that capacity, possessed the authority to control all aspects of the partnership with eBay and all actions of Live Auctioneers employees in their dealings with eBay and Plaintiffs.

93.    At all times material hereto, Ralston had knowledge of the Schedule Duration function and its manipulation by direct customers of eBay.

94.    Ralston directly and actively participated in the unfair and deceptive trade practices detailed herein by:

        a.    failing to disclose accurately to Plaintiffs and other Live Auctioneers customers the existence and use of the Schedule Duration function;

        b.    posting deceptive statements on the Live Auctioneers website concerning the use of the Schedule Duration function;

        c.    authorizing Live Auctioneers employees to offer special pricing to Plaintiffs to induce them to hold additional auctions as part of a continual pattern of deceptive acts intended to hide the actual competitive advantage being given to direct customers of eBay;

d.  failing to take any action to prohibit manipulation of the Schedule Duration function by eBay's direct customers or making such use of the Schedule Duration function available to all Live Auctioneers customers;

e.  failing to adequately direct and supervise Live Auctioneers employees in order to ensure that the deceptive and unfair trade practices detailed herein did not occur, even though Ralston knew such practices were occurring; and

f.  directing the termination of Plaintiffs' access to eBay Live Auctions as a direct result of Plaintiffs' repeated insistence that the Live Auctions platform be a safe and fair marketplace and, after Plaintiffs learned the truth concerning Molayem's sanctioned manipulation, Plaintiffs' insistence that access to the Schedule Duration function be made available to all sellers.

95.  The misrepresentations and other actions of Defendants described herein constitute unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce within the meaning of the Florida Act.

96.  Plaintiffs reasonably relied on the misrepresentations and other unfair and deceptive trade practices of Defendants, as described herein, and as a direct and proximate result thereof suffered damages in excess of $75,000.00.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in their favor and against Defendants, jointly and severally, on Count One and award Plaintiffs their actual damages together with prejudgment interest, and attorney's fees and court costs, as provided in section 501.2105, Florida Statutes, and such additional relief as the Court considers just and reasonable.

## COUNT TWO: NEGLIGENT MISREPRESENTATION
## IN PROVIDING GUIDANCE FOR USE OF THE LIVE AUCTIONS PLATFORM
## AGAINST EBAY AND LIVE AUCTIONEERS

97. Plaintiffs hereby incorporate paragraphs 1-79 as if fully set forth herein.

98. This is an action for damages in excess of this Court's jurisdictional limits.

99. At all times material hereto, eBay and Live Auctioneers, severally and jointly through their partnership, represented to prospective Live Auctions sellers, including Plaintiffs, that the eBay marketplace was safe and fair and that the policies of these Defendants were to provide equal opportunity to all sellers using the Live Auctions platform.

100. eBay and Live Auctioneers represented that these rules and policies were for the protection and safety of all eBay users, and eBay and Live Auctioneers undertook a duty to enforce these rules and policies for all eBay users, including Plaintiffs, so that the Live Auctions marketplace would actually provide equal opportunity to all sellers.

101. eBay and Live Auctioneers further provided support staff to assist sellers such as Plaintiffs in their use of the Live Auctions platform and such support staff provided guidance to sellers, including Plaintiffs.

102. By making the above representations and providing a support staff, eBay and Live Auctioneers undertook a duty to enforce its rules and policies and to provide guidance in a fair and accurate manner so that all sellers, including Plaintiffs, would have an equal opportunity in the Live Auctions marketplace.

103. eBay and Live Auctioneers, severally and jointly through their partnership, breached their duty to Plaintiffs by, among other reasons, the following:

> a. negligently supplying inaccurate information for Plaintiffs' guidance regarding use of the Live Auctions platform in the setting of the auction

duration times and the availability and use of the Schedule Duration function located on the eBay Catalog Management Set-Up page;

b.  negligently misrepresenting to Plaintiffs that Plaintiffs' decrease in sales was the result of Plaintiffs' competitor holding additional auctions and that Plaintiffs could remedy the problem by also holding more auctions; and

c.  failing to exercise reasonable care or competence in communicating with Plaintiffs as to how Plaintiffs could remedy the problem caused by incorrect end times shown in the eBay general search result listings.

104.    Plaintiffs justifiably relied on eBay's and Live Auctioneers' guidance regarding their difficulties with auction duration times and the placement of lots in eBay's general search result listings, the availability and use of the Schedule Duration function, and the recommended remedy for the decrease in Plaintiffs' sales given eBay's and Live Auctioneers' superior knowledge of the workings of the Live Auctions platform and the representations eBay and Live Auctioneers made regarding the safety and equality of the eBay marketplace.

105.    Plaintiffs suffered damages as a direct and proximate result of the breach of duty by Defendants as outlined herein, in excess of $75,000.00.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in their favor and against eBay and Live Auctioneers, jointly and severally, on Count Two in the amount of Plaintiffs' damages, together with prejudgment interest, costs of this action, and such additional relief as the Court considers just and reasonable.

## JURY DEMAND

The Plaintiffs demand a trial by jury as to all issues so triable.

SAXON, GILMORE, CARRAWAY,

GIBBONS, LASH & WILCOX, P.A.

By:_____
PAUL M. QUIN, ESQ.
Florida Bar No.: 0477745
pquin@saxongilmore.com
JOHN B. GIBBONS, ESQ.
Florida Bar No.: 242901
jgibbons@saxongilmore.com
201 East Kennedy Boulevard, Suite 600
Tampa, Florida 33602
Phone: (813) 314-4500
Fax:    (813) 314-4555
Counsel for Plaintiff

e:\skibbee\pldg\complaintpq3.doc